1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11  DONALD L. BRANNON                )
                                     )
12                    Plaintiff,     )
                                     )    No.  CV-05-1935-HU
13       v.                          )
                                     )
14  JO ANNE B. BARNHART,             )
    Commissioner, Social Security    )    FINDINGS & RECOMMENDATION
15  Administration,                  )
                                     )
16                    Defendant.     )
    ─────────────────────────────────)

17
    Alan Stuart Graf
18  P.O. Box 98
    Summertown, Tennessee 38483
19
         Attorney for Plaintiff
20
    Karin J. Immergut
21  UNITED STATES ATTORNEY
    District of Oregon
22  Neil J. Evans
    ASSISTANT UNITED STATES ATTORNEY
23  1000 S.W. Third Avenue, Suite 600
    Portland, Oregon 97204-2902
24
    David R. Johnson
25  SPECIAL ASSISTANT UNITED STATES ATTORNEY
    Social Security Administration
26  701 5th Avenue, Suite 2900, M/S 901
    Seattle, Washington 98104-7075
27
         Attorneys for Defendant
28


1 - FINDINGS & RECOMMENDATION

1  HUBEL, Magistrate Judge:

2      Plaintiff Donald L. Brannon brings this action for judicial

3  review of the Commissioner's final decision to deny disability

4  insurance benefits (DIB) and supplemental security income (SSI).

5  This Court has jurisdiction under 42 U.S.C. § 405(g). I recommend

6  that the Commissioner's final decision be affirmed.

7                    PROCEDURAL BACKGROUND

8      Plaintiff applied for DIB and SSI in December 2002, alleging

9  an onset date of June 1, 2002. Tr. 85-87, 657-660.[1]  His

10 applications were denied initially and on reconsideration. Tr. 66-

11 70, 73-75, 662-66, 668-70.

12     On January 18, 2005, plaintiff, represented by counsel,

13 appeared for a hearing before an Administrative Law Judge (ALJ).

14 Tr. 679-747. On April 29, 2005, the ALJ found plaintiff not

15 disabled. Tr. 24-40. The Appeals Council denied plaintiff's

16 request for review of the ALJ's decision. Tr. 9-12.

17                     FACTUAL BACKGROUND

18     Plaintiff alleges disability based on obesity, depression,

19 irregular heartbeat, diabetes, and sleep apnea. Tr. 98. At the

20

21        [1] Although likely immaterial, I note that while the ALJ in
   the ALJ's written opinion, and defendant in its legal memorandum,
22 both assert that plaintiff filed his applications on December 12,
   2002, that date is not readily apparent from the applications
23 themselves. The DIB application, at pages 85-87 of the
   Administrative Record, bears a typewritten date of December 30,
24 2002, in the top right corner of all pages, and was signed by
   plaintiff on January 17, 2003. The SSI application, at pages
25 657-60 of the Administrative Record, bears a typewritten date of
   January 22, 2003 in the top right corner of all pages, and was
26 signed by plaintiff on January 28, 2003. While it could be that
   the December 12, 2002 date is based upon a phone call or office
27 visit by plaintiff, that date is not reflected in the
   applications themselves.
28

2 - FINDINGS & RECOMMENDATION

time of the January 18, 2005 hearing, plaintiff was forty-four years old. Tr. 264. He has a General Equivalence Diploma (GED). Id. His past relevant work is as a logger, unloader, and a lumber mill worker. Tr. 99, 127-34. He last worked in June 2002. Tr. 99.

I.  Medical Evidence

For many years, plaintiff's treating physician has been Dr. John Crocker, M.D. The treatment records go back to at least 1978. Tr. 423. Dr. Crocker practices at Dunes Family Medical Care Clinic, and although plaintiff was sometimes seen by other practitioners there, his primary physician was Dr. Crocker. Tr. 358-463.

In November 1992, plaintiff complained of low back pain, which he stated he had experienced intermittently since an on-the-job injury in 1988, although the medical records show no prior complaints to medical practitioners. Tr. 405. On physical examination, plaintiff's flexion was limited to approximately twenty degrees. Id. Straight leg raising was negative, although there was pain upon straightening the left leg. Id.

X-rays of the lower spine showed some degenerative changes about the thoracolumbar junction, as well as evidence of degenerative arthritis and degenerative disc disease at L4-5 and L5-S1 levels. Tr. 442. The x-rays also showed considerable disc space narrowing at both of those levels. Id. There was also some sclerosis about the left sacroiliac joint. Id.

Plaintiff was instructed to take a non-steroidal anti-inflammatory medication, and was referred to a low back strengthening program with the physical therapy department. Tr.

3 - FINDINGS & RECOMMENDATION

405.   No documentation of plaintiff's participation in such a program appears in the Administrative Record.

On February 19, 1994, a chart note entered by someone in Dr. Crocker's office regarding a phone call made to the clinic by plaintiff's wife, notes that plaintiff has a history of sleep apnea, although I see no prior reference to this in the Administrative Record.   Tr. 403.   Apparently, on that date, plaintiff fainted while at a local bar.   Id.; Tr. 644.   At the emergency room, he reported that he was suspicious that maybe he had sleep apnea syndrome because he snored a lot, woke up frequently at night, and felt a bit tired throughout the day.   Tr. 644.   He told the emergency room physician that he was considering formal evaluation of his problem in the near future.   Id.

Although the precise cause of this singular fainting episode was undetermined, Tr. 644-45, plaintiff did pursue treatment for his sleep apnea.   Tr. 318-19.   Plaintiff underwent a sleep study at Sacred Heart General Hospital in Eugene, in April 1994, under the care of Dr. Robert G. Tearse, M.D.   Id.   He diagnosed plaintiff as having severe obstructive sleep apnea, and recommended treatment by CPAP[2] or surgery.   Tr. 319.

Plaintiff had a trachesotomy and uvulopalatopharyngoplasty on May 23, 1994.   Tr. 640-41.   A follow-up sleep study by Dr. Tearse in June 1994, showed that the obstructive sleep apnea persisted despite the surgery and that plaintiff continued to suffer moderate sleep disturbance.   Tr. 513-14.

---

[2]   "CPAP" stands for nasal continuous positive airway pressure.   The Merck Manual 1415 (17th ed. 1999).

4 - FINDINGS & RECOMMENDATION

1    In early May 1998, plaintiff suffered an on-the-job injury
2  resulting in a left humeral head fracture and right hip pain.  Tr.
3  396.  A May 8, 1998 x-ray of the right hip showed no evidence of a
4  pelvic or hip fracture, but did reveal a "small bony density along
5  the  superior  lateral  aspect  of  the  acetabulum  that  likely
6  represents a small overhanging osteophyte."  Tr. 614.

7    A follow-up x-ray on June 11, 1998, continued to show no
8  evidence of right hip fracture or dislocation.  Tr. 610.  Plaintiff
9  was  examined  by  Dr.  Richard  J.  Sandell,  M.D.,  an  orthopedic
10  surgeon.  Tr. 529.  He noted that plaintiff sustained pain in the
11  right hip as a result of his May 1, 1998 injury, and that plaintiff
12  continued to complain of that pain at the time of examination in
13  June.  Id.

14    Dr. Sandell stated that while the x-rays showed "a suspicion
15  of a small chip at the edge of the acetabulum[,] the current x-rays
16  showed "that this chip is healed in place and hopefully, as time
17  goes on, the pain in the hip will resolve."  Id.

18    On July 9, 1998, Dr. Sandell reported that plaintiff was
19  improving "very well."  Tr. 528.  He noted that plaintiff's hip
20  pain was improving gradually, that plaintiff was no longer limping,
21  and that plaintiff's hip had a full range of motion.  Id.  He
22  anticipated that plaintiff would soon be ready to return to work.
23  Id.

24    On July 23, 1998, Dr. Sandell noted that plaintiff's right hip
25  aches at the end of the day which was not unexpected because of the
26  blow he sustained there.  Tr. 527.  Plaintiff's final visit with
27  Dr. Sandell was on October 2, 1998.  Tr. 525-26. At that time, Dr.
28  Sandall described plaintiff's hip injury as a contusion of the

5 - FINDINGS & RECOMMENDATION

right trochanteric area.  Tr. 525.  He noted that plaintiff had been cleared for work on July 27, 1998, at which time plaintiff went back to logging.  Id.  He further noted, however, that handling the heavy saws caused discomfort in his shoulder and because he did not feel he could continue with it, he quit and was working at Wal-Mart doing loading and unloading.  Id.  Plaintiff reported to Dr. Sandell that he was able to do the Wal-Mart work satisfactorily.  Id.  Plaintiff further reported to Dr. Sandell that he had no discomfort or pain in the right hip, even when walking on concrete.  Id.

Dr. Sandell summarized plaintiff's status by reporting that

> [t]he right hip injury that he sustained was a contusion, and has resolved very nicely.  The right hip condition certainly is stationary and has ben stationary as of the last evaluation.  There is no strength loss in the right lower extremity at all and no neurologic deficits.  There certainly is no impairment.

Tr. 526.  He concluded that plaintiff needed no further treatment. Id.

In the fall of 1998, plaintiff complained of episodes of heart palpitations and skipped beats, along with occasional dizziness. Tr. 390.  Dr. Crocker noted that plaintiff had "trace pitting edema of both ankles" and that both of his hands were somewhat puffy. Id.  There was no jugular venous distention, his chest was clear, and his heart showed a regular rhythm.  Id.  His EKG was normal. Id.  Dr. Crocker concluded that plaintiff's palpitations probably represented paroxysmal atrial tachycardia.  Id.  He also noted that plaintiff had elevated blood pressure.  Id.  He started plaintiff on "Z-beta," five milligrams per day, and suggested a Holter monitor and chest x-ray, which plaintiff deferred until later

because he was not yet covered by his employer's insurance, but would be the following month. Id.

In early 1999, chest x-rays ordered in response to plaintiff's complaints of an irregular heartbeat, showed the presence of mild left lower lobe subsegmental atelectasis[3], but no evidence of pulmonary vascular congestion. Tr. 436. On January 22, 1999, plaintiff complained of feeling lethargic and slowed down on the "Zebeta," although he stated that it had helped to relieve his symptoms. Tr. 389. Dr. Crocker switched plaintiff to a different medication, Cardizem CD, a calcium channel blocker. Id. Plaintiff also complained of not sleeping well and feeling depressed, although Dr. Crocker does not appear to have discussed those complaints at that visit. Id.

Plaintiff's irregular heartbeat complaints continued in late 1999 and early 2000. Tr. 386. On January 14, 2000, Dr. Crocker prescribed Prilosec. Id. On January 28, 2000, Dr. Crocker noted that plaintiff's "[d]yspnea[4] on exertion" was becoming extreme, and that he had some orthopnea[5] on occasion. Tr. 385. There was no

---

[3]  "Atelectasis" is a "collapsed or airless condition of the lung." F.A. Davis, Taber's Cyclopedic Medical Dictionary 136 (14th ed. 1981). "Subsegmental" refers to the condition occurring in a particular place in the lung. See www.biology-online.org/dictionary (defining the term "subsegmental atelectasis" to mean "collapse of the portion of the lung distal to an obstructed subsegmental bronchus, manifested as a linear opacity on a chest radiograph.").

[4]  "Air hunger resulting in labored or difficult breathing[.]" Taber's 442.

[5]  "Respiratory condition in which there is discomfort in breathing in any but erect sitting or standing position." Taber's 1003.

7 - FINDINGS & RECOMMENDATION

1    particular swelling.  Id.  Plaintiff was still taking Cardizem CD,
2    but his blood pressure had been up and he continued to have a fair
3    amount of palpitations.  Id.

4        Dr. Crocker suspected that plaintiff had some "[congestive
5    heart failure]/pulmonary edema complicating sleep apnea."  Id.  He
6    stated that plaintiff's hypertension could be either the result or
7    part of the etiology for his current problems.  Id.  He planned to
8    continue with the Cardizem CD, but also added Lasix, a diuretic,
9    and ordered an echocardiogram.  Id.

10       A "very technically limited echo" was performed on February 1,
11   2000.   Tr. 384.   It showed "probably normal left ventricular
12   systolic function," with left ventricular hypertrophy.  Id.

13       On February 2, 2000, Dr. Crocker noted that plaintiff
14   continued to be quite symptomatic for his sleep apnea.  Id.  Dr.
15   Crocker concluded that plaintiff's sleep apnea was probably his
16   primary problem, causing some of the cardiac arrhythmias.  Id.  He
17   decreased the Cardizem CD, and planned to start Metoprolol, a beta
18   blocker, for plaintiff's hypertension.  Id.  He also planned to
19   refer plaintiff to Dr. Tearce for consideration of further
20   treatment for the sleep apnea.  Id.

21       Plaintiff's fiancé called Dr. Crocker's office on February 9,
22   2000, to report that they could not afford to see Dr. Tearse
23   without insurance.  Id.  She noted that Dr. Tearse's office
24   recommended that Dr. Crocker prescribe a CPAP.  Id.  This was
25   apparently then prescribed by Dr. Crocker, along with a particular
26   pressure setting.  Id.

27       On September 21, 2000, plaintiff complained of being stressed,
28   irritable, and experiencing mood swings, after losing two close

8 - FINDINGS & RECOMMENDATION

friends and an aunt recently. Tr. 377. He reported having trouble coping with a lot of his emotions. Id. He also noted unusual chest pain symptoms, but had difficulty describing them in detail. Id.

Dr. Anne Todd, a physician in Dr. Crocker's office, noted that plaintiff seemed emotionally volatile and on the verge of tears several times throughout his interview. Id. On physical examination, his heart had a regular rate and rhythm and an in-office EKG was within normal limits. Id.

Dr. Todd diagnosed plaintiff as suffering from anxiety and depression. Id. She gave Celexa, an anti-depressant, and instructed him to follow up with Dr. Crocker in three weeks. Id.

On October 14, 2000, plaintiff reported doing a lot better after just a few days taking Celexa. Id. His anhedonia[6] was reported as much improved. Id. He also reported using his CPAP at 12 centimeters of water at night and reportedly was sleeping fairly well. Id. He continued to smoke one pack of cigarettes per day, and averaged six beers per week. Id.

On December 22, 2000, plaintiff's fiancé phoned Dr. Crocker's office to request additional samples of Celexa. Tr. 370. These were provided. Id.

On May 4, 2001, Dr. Crocker noted that plaintiff could increase his Celexa to 40 milligrams per day, but that he may not notice any results with the increase for a few weeks. Id.

On September 10, 2001, plaintiff reported feeling light

---

[6] "Lack of pleasure in acts which are normally pleasurable." Taber's 86.

9 - FINDINGS & RECOMMENDATION

headed, usually after exertion.  Tr. 375.  He also noted "heavy feelings" in his chest and some visual disturbances.  Id.  He had stopped taking Celexa one week earlier.  Id.  Dr. Mark Pasternak, the physician who saw plaintiff at this visit, noted that plaintiff's medical history was significant for severe obesity, sleep apnea, hypertension, and alcohol abuse.  Id.  He weighed more than 350 pounds at the time.  Id.

Dr. Pasternak also noted that plaintiff's chart review showed an extensive prior workup for sleep apnea and palpitations.  Id. He reported that the echocardiogram was technically limited, but showed probable normal left ventricular systolic function and left ventricular hypertrophy.  Id.  His holter monitor showed some ventricular ectopic beats and runs of superventricular tachycardia up to a rate of 136, after which he was begun on the beta blocker. Id.  His baseline EKG was unremarkable.  Id.

Dr. Pasternak noted that at the time, plaintiff was asymptomatic.  He was given a prescription for Meclizine, an antihistamine, for dizziness, and was told to add an aspirin to his Metoprolol.  Id.  Dr. Pasternak ordered blood work and discussed issues of weight loss and tobacco use.  Id.

Plaintiff saw Dr. Pasternak again the next day.  Tr. 371.  He stated he felt better than the day before, although he still had some chest discomfort and his visual disturbances were unchanged. Id.  The Meclizine had helped the dizziness slightly.  Id.  His lab work was all within normal limits.  Id.  Dr. Pasternak consulted with a neurologist about the visual symptoms and, based on the neurologist's opinion, and his own, he could conclude only that the symptoms could be related to the withdrawal from Celexa, which he

noted that plaintiff had resumed taking. Id. He recommended that plaintiff have a treadmill test. Id.

On September 19, 2001, plaintiff underwent a nondiagnostic exercise stress test because his obesity, his history of smoking cigarettes, and his father's having had a heart attack, created significant cardiac risk factors for plaintiff. Tr. 432. In addition, he had experienced several episodes of lightheadedness and pain across his chest, as well as decreased energy. Id.

Plaintiff took his Metoprolol in the morning before doing the stress test. Id. He was exercised on a "2-minute Bruce protocol" for a total of 5 minutes, 26 seconds, and 1 minute, 26 seconds into the third stage. Id. At that point, it became clear that his maximum heart rate was not going to rise above 130, and the test was terminated. Id.

Although plaintiff experienced some knee and leg discomfort, he had no chest pain, his ST segments were stable, and there were no dysrhythmias identified. Id. His exercise tolerance was rated as fair. Id.

Plaintiff repeated the test a few days later without having taken his Metoprolol. Tr. 431. He exercised for a total of six minutes, to the end of the third stage, and achieved the predicted maximum heart rate of 152 beats per minute at 1 minute and 25 seconds into the third stage. Id. The test was stopped due to plaintiff's exhaustion. Id. Although he had no dysrhythmias during exercise, an intermittent dysrhythmia was noted during recovery, leading to a conclusion that he has an "intermittent left bundle branch block." Id. These intermittent episodes spontaneously resolved and produced no associated symptoms. Id.

11 - FINDINGS & RECOMMENDATION

1    In January 2002, plaintiff reported a decrease in energy and
2  a marked decrease in his libido.  Tr. 368.  He also reported that
3  his sleep was "pretty good."  Id.  He was continuing to take Celexa
4  and Metoprolol.  Id.  Dr. Crocker suggested he might taper down the
5  Celexa dose or consider switching to a different anti-depressant.
6  Id.

7    A couple of weeks later, on February 7, 2002, plaintiff told
8  Dr. Crocker he still was not feeling well and continued to have a
9  poor energy level.  Id.  Dr. Crocker prescribed Nexium, one capsule
10 daily, for heartburn.  Id.

11   On September 7, 2002, plaintiff continued to report a decrease
12 in energy, along with ankle swelling, wheezing, and cough.  Tr.
13 366.  His current medications were Celexa and Metoprolol.  Id.  Dr.
14 Crocker wanted him to decrease the Celexa and start Wellbutrin, a
15 different anti-depressant medication.  Id.  He again gave plaintiff
16 samples of Nexium.  Id.

17   Later in September 2002, plaintiff presented to the emergency
18 room of Lower Umpqua Hospital complaining of increased abdominal
19 swelling for one-week, feeling poorly, swelling in the extremities,
20 nausea, cough, fever, and dizziness.  Tr. 428.  Dr. Crocker noted
21 that plaintiff's abdomen was quite protuberant, although it was not
22 tender.  Id.  After a physical exam and laboratory tests, the cause
23 of the swelling was undetermined.  Id.  He was treated with Lasix
24 and scheduled for an ultrasound.  Id.  The ultrasound was
25 inconclusive due to poor visualization.  Id.

26   On October 4, 2002, plaintiff continued to feel poorly.  Tr.
27 365.  On that date, his "mini-chem" showed a blood sugar of 231, he
28 had right upper quadrant tenderness, and he weighed more than 350

12 - FINDINGS & RECOMMENDATION

1  pounds.  Id.

2  Dr. Rajesh Ravuri, M.D., an endocrinologist, performed a lower

3  extremity venous ultrasound on plaintiff on October 16, 2002,

4  because of plaintiff's edema. Tr. 231. He stated that the "study

5  looks satisfactory." Id. There was no evidence of deep vein

6  thrombosis, but, he stated, not all calf clots can be identified by

7  ultrasound and thus, if plaintiff remained symptomatic, a follow-up

8  study might be indicated. Id.

9  In an October 24, 2002 report, Dr. Ravuri noted that

10  plaintiff's chest x-ray was normal, his abdominal ultrasound was

11  normal, and his lower extremities appeared normal. Tr. 225.

12  Plaintiff's basic metabolic panel was normal, indicating that his

13  kidney function was normal. Id. Plaintiff had started improving

14  on Lasix, and reported at the time to be feeling much better with

15  no further complaints. Id.

16  Dr. Ravuri diagnosed plaintiff with diabetes mellitus type II.

17  Id. He started him on metformin and advised him on appropriate

18  diet and exercise. Id. He also sent plaintiff to the "Diabetic

19  Center" for better counseling on the type of food he needed to eat.

20  Id. Dr. Ravuri strongly advised plaintiff to stop drinking and

21  smoking. Id. He referred plaintiff back to Dr. Crocker. Id.

22  On November 9, 2002, Dr. Crocker noted that plaintiff had been

23  put on metformin by Dr. Ravuri. Id. He was also taking ibuprofen

24  as needed, Metoprolol, and Wellbutrin. Id. Dr. Crocker noted that

25  plaintiff had been doing "really pretty well in general," although

26  he did have a low energy level and orthopnea. Id. He also noted

27  that plaintiff reported that he continued to feel somewhat

28

1  dysphoric[7], but his mood had improved somewhat.  Id.

2      In the objective section of his chart note, Dr. Crocker noted

3  that plaintiff's mood was "upbeat and bright."  Id.  He described

4  him as being "really quite pleasant and jovial.  His affect is

5  really quite bright."  Id.

6      On December 10, 2002, Dr. Crocker noted that plaintiff

7  appeared to be tolerating the Metformin quite well, although Dr.

8  Crocker increased the dose because plaintiff's evening and fasting

9  blood sugars were still running high.  Tr. 364.  He was still

10 taking Wellbutrin to help with depression and to assist in

11 decreasing his tobacco consumption.  Id.  Plaintiff reported

12 feeling pretty fatigued most of the time and "quite down in the

13 dumps."  Id.  He also reported having the sensation of not wanting

14 to leave his house.  Id.

15     Apparently, plaintiff's weight had gone up because at this

16 visit, his weight noted to be down to just over 400 pounds.  Id.

17 Dr. Crocker described his mood as "upbeat" and his affect as

18 "fairly bright."  Id.  In addition to increasing the Metformin, Dr.

19 Crocker prescribed Effexor, an anti-depressant, and then a tapering

20 down of the Wellbutrin to one daily.  Id.

21     On January 15, 2003, plaintiff's fasting blood sugars were

22 reported to have come down with plaintiff reporting feeling better

23 as a result.  Tr. 363.  Plaintiff reported some dysphagia[8],

24 although he denied experiencing chest pain, dyspnea on exertion,

25

26     [7]  "Exaggerated feeling of depression and unrest without
   apparent cause."  Taber's 442.

27

28     [8]  "Inability to swallow or difficulty in swallowing."
   Taber's 442.

14 - FINDINGS & RECOMMENDATION

diaphoresis[9], ankle swelling, orthopnea, paroxysmal nocturnal dyspnea, shortness of breath, wheezing, or cough. Id. He continued to take Effexor and Wellbutrin and was "feeling really quite well in terms of his mood and sense of well-being." Id. His weight was up three pounds from the previous month, but he appeared in no acute distress. Id. Dr. Crocker described his mood as upbeat and his affect as bright. Id.

Dr. Crocker continued plaintiff on Effexor, Wellbutrin, and Metoprolol, and Lasix as needed. Id. He also prescribed Zantac for the dysphagia. Id.

Plaintiff was examined by Dr. Charles Reagan, M.D., a psychiatrist, on April 17, 2003. Tr. 262-66. Dr. Reagan noted that plaintiff's first episode of sad mood appeared to be related to bereavement, and that it might have evolved into major depression. Tr. 265. Later, however, he believed that plaintiff experienced a major depressive episode that appears to have been of moderate intensity. Id. He noted that plaintiff had responded to the Wellbutrin and Effexor. Id. He remarked, however, that the depression could be confused by the diagnosis of severe central and obstructive sleep apnea, which appeared to have been treated at the time of the examination. Id. As Dr. Reagan explained, "[o]ne would have to take him off the medications to see if he remains depression-free. That would help make the diagnosis as to whether he has recurring depression at the least. I think the diagnosis of major recurrent depression is likely; however, his sad mood may have been a function of untreated sleep apnea as well." Id.

---

[9]   "Profuse sweating." Taber's 400.

15 - FINDINGS & RECOMMENDATION

1    Dr. Reagan observed no pain behavior, noting that plaintiff

2    walked without difficulty, arose from the chair without difficulty,

3    sat down without difficulty, and appeared to have no difficulty

4    while sitting in the chair.  Id.

5    His diagnosis was of recurrent major depression versus sad

6    mood from sleep apnea.  Id.  He noted that plaintiff was moderately

7    isolated.  Tr. 266.  He assessed plaintiff with a Global Assessment

8    of Functioning (GAF) score of 55.  Id.

9    On May 9, 2003, Dr. Martin Lahr, a non-examining physician,

10   assessed plaintiff's residual functional capacity as being able to

11   occasionally lift fifty pounds, frequently lifting twenty-five

12   pounds, standing and/or walking for at least two hours in an eight-

13   hour work day, sitting about six hours in an eight-hour workday,

14   and with an unlimited ability to push and pull.  Tr. 273.  He

15   concluded that plaintiff was occasionally limited in climbing, but

16   frequently limited in balancing, stooping, kneeling, crouching, and

17   crawling.   Tr.  274.   He  found  no  manipulative,  visual,

18   communicative, or environmental limitations. Tr. 275-76. Although

19   he  concluded  that  the  symptoms  expressed  by  plaintiff  were

20   attributable  to  a  medically  determinable  impairment,  he  also

21   concluded  that  the  severity  or  duration  of  the  symptoms  were

22   disproportionate  to  the  expected  severity  or  expected  duration.

23   Tr. 277.  On August 5, 2003, Disability Determination Services

24   physician Dr. Scott Pritchard reviewed the evidence in the file and

25   affirmed Dr. Lahr's May 9, 2003 assessment.  Id.

26   On June 3, 2003, plaintiff's weight was 404.6 pounds, which

27   Dr. Crocker noted was pretty stable over the past couple of months.

28   Tr. 360.  He  was  still  taking  Effexor,  Wellbutrin,  Metoprolol,

metformin, as well as Lasix as needed.  Id.  Plaintiff reported a
significant amount of "DOE," stating that even with walking across
the room he gets quite short of breath.  Id.  Dr. Crocker noted
that plaintiff had some bilateral ankle edema.  Id.  He described
plaintiff's affect as fairly bright and described him as pleasant
and conversant.  Id.  He instructed plaintiff to take the Lasix
daily, and wanted him to have a chest x-ray, which was normal.
Id.; Tr. 491.  Plaintiff advised Dr. Crocker that he had been seen
at Douglas County Mental Health for ongoing counseling.  Tr. 360.

On June 17, 2003, plaintiff reported doing "okay" on the daily
Lasix.  Tr. 359.  Dr. Crocker continued plaintiff on his current
medications, although he adjusted the Metoprolol dosage to better
control plaintiff's blood pressure.  Id.

On July 2, 2003, plaintiff saw Dr. Dale Harris, a practitioner
in Dr. Crocker's clinic, for complaints of sinus congestion and
lung congestion.  Tr. 359.  Dr. Harris diagnosed plaintiff as
having bronchitis and prescribed an antibiotic.  Tr. 358.  He also
counseled plaintiff regarding his diabetes and its relationship to
skin infections, which plaintiff was experiencing.  Id.  Plaintiff
also reported that he was having difficulty using his CPAP machine
because of his congestion, but he indicated he would follow up with
Dr. Crocker if the problem continued.  Id.

On July 31, 2003, Dr. Crocker reported that plaintiff was
having some hypoglycemia-type symptoms which were relieved by
eating.  Tr. 489.  He noted that plaintiff otherwise was "feeling
pretty good."  Id.

Dr. Crocker next saw plaintiff on August 28, 2003, and
remarked that plaintiff was feeling fairly well in general, his

17 - FINDINGS & RECOMMENDATION

1  appetite was good, his sleep was fair, and his energy level fair.

2  Tr. 487.  His mood had been fairly good on the Effexor.  Id.  He

3  was in no acute distress.  Id.  Dr. Crocker further remarked that

4  both his hypertension and diabetes needed better control.  Id.  He

5  prescribed Lisinopril, an ACE inhibitor, for his hypertension and

6  Actos, an oral diabetic medication, and instructed him to continue

7  with his other medications.  Id.

8      On September 10, 2003, Dr. Crocker completed a physical

9  residual functional capacity questionnaire for plaintiff.  Tr. 302-

10  10.  He first concurred with plaintiff's report of the following

11  diagnoses:  anxiety, depression, low back and leg pain, severe

12  sleep apnea, fatigue, high blood pressure, diabetes, steel plates

13  in the left leg with screws, broken left arm, fractured left elbow,

14  crushed left shoulder, broken left ankle with plate and screws,

15  fractured right hip, and shortness of breath.  Tr. 302.  Dr.

16  Crocker added that plaintiff also suffered from obesity, muscle

17  contraction headaches, and palpitations.  Tr. 303.

18      He opined that plaintiff's report that on a good day, he could

19  sit, on average, for approximately 45 minutes because of severe low

20  back pain, and then must rest for 10 to 15 minutes, was consistent

21  with plaintiff's medically diagnosed condition.  Tr. 306.  He

22  opined that plaintiff's report that on a good day, he could stand,

23  on average, for approximately 10 to 15 minutes before onset of

24  severe pain, and then must rest for 10 to 15 minutes, was

25  consistent with plaintiff's medically diagnosed condition.  Id.

26      Next, Dr. Crocker opined that plaintiff's report that on a

27  good day, he could walk, on average, for approximately less than

28  ten minutes before onset of severe pain, and then must rest for ten

18 - FINDINGS & RECOMMENDATION

to fifteen minutes, was consistent with plaintiff's medically diagnosed condition.  Tr. 307.  He did not disagree with plaintiff's report that on a good day, he could engage in normal work activity involving alternating sitting, standing, and walking for one to two hours without onset of severe pain, and that on a bad day, plaintiff could do such activities for less than one hour. Id.

Dr. Crocker was unable to confirm plaintiff's report that he could lift light weights occasionally, without symptoms, as long as he does not have to bend over.  Id.  Plaintiff reported that bending causes shortness of breath and a feeling like his head was going to explode.  Id.  Dr. Crocker could not remember, nor did he have a record of, these symptoms.  Id.

Dr. Crocker opined that plaintiff's report that he tried to avoid twisting, stooping, and crouching because they cause nearly immediate onset of breathlessness and extreme fatigue, and his report that he could seldom climb stairs without stopping and resting on at least one occasion for at least three or four minutes, was consistent with plaintiff's medically diagnosed condition.  Tr. 308.  He also stated that plaintiff's report that fatigue, depression, anxiety, and shortness of breath caused severe interference with his ability to concentrate, on average, four or more days per month, was consistent with his medically diagnosed condition.  Id.

Dr. Crocker opined that plaintiff was incapable of even low stress jobs as a result of disabling anxiety and depression, deconditioning, and sleep apnea.  Tr. 309.  He also concluded that plaintiff's report that plaintiff's illnesses would cause him to be

19 - FINDINGS & RECOMMENDATION

1  absent from work on average, four or more days per month, was
2  consistent with his medically diagnosed conditions.  Id.

3      Dr. Crocker found all of plaintiff's reports about his
4  condition to be credible.   Tr. 306-10.   He also expected
5  plaintiff's condition to remain the same.  Tr. 310.

6      On September 19, 2003, plaintiff reported to Dr. Crocker's
7  office that he was feeling fine and going on vacation.   Id.   On
8  October 16, 2003, he complained of severe head pain.  Tr. 486.  He
9  also complained of vertigo when prone.  Id.  Additionally, he noted
10 that he had had a recurrence of right lateral hip pain and low back
11 pain.  Id.  Dr. Crocker noted that plaintiff had "had some low back
12 problems over the years."  Id.

13     Plaintiff was tolerating his medications well, and reported
14 that his mood was somewhat better.  Id.   His weight was 397.4
15 pounds, a pound less than in August.  Id.  His mood was "upbeat"
16 and his affect was bright.  Id.  He had mild tenderness over the
17 areas of the left greater trochanter, but his range of motion of
18 his hip and knee were normal, and he had no tenderness with
19 palpation in the lumbar area or the sacroiliac joint.  Id.

20     Spinal x-rays taken on that date showed moderately severe
21 degenerative disc disease changes at L4-5, with facet
22 osteoarthrosis at L4-5 and L5-S1.  Tr. 490.  Dr. Crocker noted the
23 results during plaintiff's November 12, 2003 visit, at which Dr.
24 Crocker indicated he would prescribe Voltaren, a non-steroidal
25 anti-inflammatory drug, twice per day.  Tr. 485.  His chart note
26 from that visit indicates intermittent low back pain had been worse
27 recently.  Id.  He assessed plaintiff as suffering from low back
28 pain, probably due to degenerative joint disease or degenerative

disc disease.  Id.  He also noted that the control of plaintiff's diabetes seemed to be improving on the Actos and Lisinopril.  Id.

On November 18, 2003, plaintiff reported continuing back pain, despite the Voltaren.  Tr. 483.  He also noted that his appetite and energy levels were "off."  Id.  Dr. Crocker made no other remarks about plaintiff's back at that time.  Id.

On December 23, 2003, Dr. Crocker reported that according to plaintiff, the Voltaren did not help his arthritis pain much.  Tr. 481.  Plaintiff reported that his appetite was good, and his sleep fairly good.  Id.  Dr. Crocker made an assessment of degenerative arthritis without further comment, although he did prescribe Naprosyn, another non-steroidal anti-inflammatory medication.  Id. He noted that plaintiff would continue on his current diabetic regimen including Actos and Metformin, as well as continuing with Metoprolol, Lasix, and Lisinopril, and one aspirin daily.  Id.

On February 12, 2004, plaintiff had not yet tried the Naprosyn.  Tr. 480.  Dr. Crocker noted that plaintiff was "doing pretty well."  Id.  His mood was upbeat and his affect was bright. Id.  His assessment included musculoskelatal pain and he again prescribed Naprosyn.  Id.

On March 17, 2004, plaintiff complained of a nagging cough and numbness in his arms which Dr. Crocker described as being "more position related than anything else." Tr. 479.  Dr. Crocker noted that otherwise, plaintiff had been feeling "pretty well."  Id. Plaintiff was well appearing and in no acute distress, with a fairly upbeat mood and a fairly bright affect.  Id.

In April 2004, plaintiff complained of chest pain.  Tr. 478. Dr. Crocker recited all of plaintiff's previous cardiac testing and

21 - FINDINGS & RECOMMENDATION

1  then ordered plaintiff to undergo a nuclear medicine stress test.

2  Tr. 476-77.  In his assessment, Dr. Crocker noted that plaintiff's

3  hypertension was reasonably, although not optimally, controlled,

4  but that the control of his diabetes "seems pretty good."  Id.  He

5  also noted that plaintiff was achieving a "good response" to his

6  obstructive sleep apnea with the CPAP machine.  Id.

7       On May 10, 2004, plaintiff underwent a second cardiac

8  treadmill stress test, in response to his complaints of chest pain.

9  Tr. 494.  He was again subjected to the "Bruce protocol."  Id.  He

10  exercised to a heart rate of 158 and experienced no chest pain,

11  shortness of breath, or cardiac arrhythmias.  Id.  The treadmill

12  was terminated, however, because of plaintiff's exhaustion.  Id.

13  The assessment was of a normal treadmill stress test to a target

14  heart rate of 158 without signs or symptoms of ischemic heart

15  disease.  Id.

16       On that same date, plaintiff also underwent a nuclear medicine

17  "myocardial perfusion study with spect" which showed a small amount

18  of stress-induced ischemia along the anteroseptal wall of the left

19  ventricle.  Id.  Plaintiff's stress ejection fraction was 55%.  Id.

20       Plaintiff followed up with Dr. Crocker on May 20, 2004.  Tr.

21  476-77.  Dr. Crocker first noted that plaintiff tries to do some

22  lawn mowing and walks a couple of hundred feet to the mailbox which

23  fatigues him quite a bit.  Tr. 477.  He continued to take

24  Metoprolol, Metformin, Wellbutrin, Lasix, Effexor, Actos, Naprosyn,

25  and aspirin daily.  Id.

26       Dr. Crocker then recited the results from the May 10, 2004

27  cardiac testing and concluded that it appeared that there was a

28  demonstration of coronary artery disease on the stress nuclear

22 - FINDINGS & RECOMMENDATION

medicine study.  Tr. 476.  Dr. Crocker referred plaintiff to a cardiologist in Eugene.  Id.

Cardiologist Dr. Jerold Hawn, M.D., saw plaintiff on June 4, 2004.  Tr. 586-87.  He noted that despite plaintiff weighing 420 pounds, an isotope stress test had been performed in May 2004, with plaintiff walking about 5 minutes on the treadmill with "no EKG abnormalities of ischemia."  Tr. 586.  He indicated that the isotope test was read as a small, tiny, high anteroseptal defect that disappeared with rest.  Id.  He noted, however, that the apex was spared, and the anterior wall was spared.  Id.  There was no transient ischemic dilatation.  Id.  He described it is a "low level situation for ischemica, and look[ing] like it does not involve a large anterior wall of the heart."  Id.  He noted that the rest of the ventricular myocardium was normal.  Id.

Dr. Hawn reviewed the May 2004 test results with another cardiologist in his office and stated that they

> agreed this was a very soft call; that there is a lesion in the high anteroseptal area that may be actually due to a septal, but it spares the anterior wall, and especially the apex, so it is not a high-grade LAD lesion.  There is no transient ischemic dilatation, and no wall motion abnormality.  His stress ejection fraction is 55%.

Tr. 587.

Dr. Hawn recited plaintiff's cardiovascular risk factors: continuing to smoke a pack of cigarettes per day, hypertensive for five to ten years on medication, a cholesterol level of 217, diabetic, and a family history of coronary disease.  Id.  Based on his physical examination and plaintiff's test results, Dr. Hawn concluded that plaintiff had "[u]ncertain diagnosis of coronary artery disease."  Id.  He explained that "[plaintiff] may have it,

but it does not look like it is involving a large epicardial coronary artery." Id.

Dr. Hawn recommended lifestyle changes. Tr. 476, 585. He noted that if plaintiff lost 100 pounds, he would do a diagnostic angiogram. Id. But, based on his interpretation of the isotope testing, he did not think there was enough evidence to warrant an angiography, especially considering, as he described, that plaintiff would be a very high risk for such a procedure. Tr. 587. He noted that plaintiff needed to lose weight, quit smoking, to control his hypertension and cholesterol, and also needed to diet and engage in an activity program. Id.

In a follow-up letter to Dr. Crocker, Dr. Hawn noted that the isotope testing showed a very small area of abnormality, unassociated with clear involvement of the LAD. Tr. 585. Dr. Hawn concluded that plaintiff's ventricular function was most likely normal. Id. He told Dr. Crocker that he "came down quite hard on him about his weight." Id.

Dr. Crocker noted on June 23, 2004, that plaintiff had been feeling fairly well in general. Tr. 476. He gave plaintiff a prescription for Nitrogylcerin for chest pain. Id. He noted that plaintiff's depression symptoms seemed to be improving somewhat. Id. He denied any further chest pain, but complained of "DOE," although he reported that he was able to walk a bit further than he had in the past. Id. Dr. Crocker assessed plaintiff as having possible coronary disease and noted that plaintiff would work on increasing his exercise and working on weight loss. Tr. 475.

From June 23, 2003, to June 23, 2004, plaintiff saw Carol Embury, M.S.W., at Douglas County Mental Health. Tr. 533-66. He

24 - FINDINGS & RECOMMENDATION

sought assistance with symptoms of depression. Tr. 565. Initially, he acknowledged that his depression had been worse and he was presently not crying as much. Id. However, he described just staring out of the window and being afraid to go out of his house. Id. It appears that plaintiff attended counseling sessions with Embury approximately once per week, or every other week. Tr. 533-66.  Id.; Tr. 566.

Early in his sessions with Embury, plaintiff reported that despite his depressive symptoms, he enjoyed working in the yard. Tr. 563. He also reported an interest in vocational or educational training, if he could find something of interest, after receiving disability. Tr. 555. At one point plaintiff stated that he really needed to "get SSI" to feel better about himself. Tr. 558. Embury encouraged him to be productive outside of the logging field. Id.

In the next session, Embury challenged plaintiff regarding his previous statement that he did not want to work on changing his life, including exploring vocational alternatives, until he received SSI, because he did not want to decrease his chances of getting benefits. Id.

In October 2003, plaintiff reported that he was doing quite well and had engaged in some family activities. Tr. 549. Embury continued to work with plaintiff regarding his "thinking errors," including that he would lose weight and go to work once he receives disability. Id.

In February 2004, plaintiff reported he was doing "pretty well" and that he was getting out "some." Tr. 543. In March 2004, he was doing "quite well" and was no longer clinically depressed. Tr. 542.

25 - FINDINGS & RECOMMENDATION

1    In June 2004, the counseling was terminated because treatment
2    was complete. Tr. 536. Embury's final progress note reports that
3    plaintiff stated that he was doing well and engaging in activities.
4    Tr. 534. She reviewed his strengths with him and discussed
5    practices needed to maintain progress. Id. Her termination
6    summary states that plaintiff had made good progress in resolving
7    symptoms of depression. Tr. 533. He was no longer exhibiting
8    active symptoms and was able to recognize negative thoughts and
9    reframe them. Id. He also worked to resolve issues around his
10   family and ex-wife. Id.

11   In her prognosis section, Embury repeated that plaintiff had
12   made good progress, but she remarked that he continued to be
13   geographically isolated "up Smith River" and so, at some point, may
14   need further counseling. Id. She noted that plaintiff would
15   benefit from being engaged in some community activities. Id. She
16   rated his GAF at termination at 72, up from 50 at the start of
17   counseling one year earlier. Tr. 535.

18   On January 17, 2005, Dr. Crocker wrote a three-page Medical
19   Report, apparently to plaintiff's attorney, answering the questions
20   of whether plaintiff would likely miss work because of physical and
21   mental difficulties, and because of necessary medical treatments,
22   and if so, why and how often. Tr. 652. Dr. Crocker first listed
23   plaintiff's history of musculoskeletal injuries over the years and
24   concluded that the injuries had healed, but have resulted in
25   residual damage which contributes to plaintiff's musculoskeletal
26   complaints in the form of degenerative arthritis and chronic muscle
27   strain. Id.

28   Next, Dr. Crocker addressed plaintiff's sleep apnea. Id. Dr.
26 - FINDINGS & RECOMMENDATION

Crocker reported that after plaintiff's surgery, he experienced much improved sleep, but still experienced moderate sleep disturbance which could cause problems with fatigue and could contribute to heart and circulatory problems. Id. Dr. Crocker noted that plaintiff had reported that the CPAP machine helped, but that plaintiff still reported poor sleep probably caused by sleep disturbances, albeit less frequently. Id. He clarified that when his chart notes state that plaintiff is sleeping "fairly well, " for example on October 14, 2004, that means "'[f]airly well' and not good." Id. Dr. Crocker stated that since plaintiff's sleep apnea surgery, plaintiff has continued to report days when he awakens exhausted and unrefreshed, but, he stated, these are far fewer than before his surgery and the use of the CPAP machine. Id. In Dr. Crocker's opinion, plaintiff's continued sleep disturbance is a significant contributing cause of fatigue and poor exercise tolerance. Id.

Dr. Crocker then addressed plaintiff's cardiovascular problems which he noted included hypertension and palpitations caused by cardiac arrhythmias, going back to 1994. Id. He recited test results from January 8, 2000, and January 18, 2000, as showing that plaintiff had abnormal atrial rhythm/tachycarida, ventricular ectopic beats, supra ventricular ectopic beats, and at other times sinus rhythm. Tr. 652-53.

After reviewing the results of plaintiff's echocardiogram and stress tests, and Dr. Hawn's report, Dr. Crocker concluded that plaintiff is at high risk of myocardial infarction. Tr. 653.

As for his diabetes, Dr. Crocker stated that plaintiff was currently taking two oral medications with reasonably good control.

27 - FINDINGS & RECOMMENDATION

Id.  He noted, however, that plaintiff still has days when his blood sugars fluctuate significantly and on those days, he is "wiped out" for the day.  Id.

Dr. Crocker noted that he had prescribed various medications for plaintiff's depression, and had referred him to counseling. Id.  Plaintiff had reported, and Dr. Crocker agreed, that the counseling and medications have been helpful.  Id.  However, Dr. Crocker stated, plaintiff still had episodes of dysphoria when he is overcome by feelings of helplessness, and these usually last more than one day.  Id.  He expected the episodes to continue, despite ongoing treatment with medication and counseling.  Id.  He concurred with Dr. Reagan's April 17, 2003 report which noted a diagnosis of re-current major depression.  Id.

Dr. Crocker noted plaintiff's attacks of anxiety with agoraphobia and stated that they frequently interfere with plaintiff's life.  Id.  He stated that he had personally witnessed such attacks, and when they occur, they are often severe.  Id.  He stated that they do respond to medication, but that plaintiff still experiences episodes of break-through anxiety when he finds it impossible to leave the house to walk to the mailbox.  Id.

Dr. Crocker opined that plaintiff suffered from a "rather severe low back condition."  Id.  He recited the results of plaintiff's 2003 x-rays showing moderately severe degenerative disc disease.  Id.  In his opinion, the x-ray results could clearly account for severe episodes of low back pain.  Tr. 653-54.  He further remarked that the osteophyte in plaintiff's hip and the healed bone chip in that same hip contribute to the episodes of low back pain.  Tr. 654.

28 - FINDINGS & RECOMMENDATION

1    Dr. Crocker also noted that plaintiff had neck pain radiating

2  into his shoulders, although he indicated that a March 20, 2003

3  cervical spine MRI was normal.  Id.  However, he explained that it

4  is not unheard of for low back pain to set off neck pain.  Id.  In

5  his opinion, he suspected it was more likely related to soft tissue

6  pain such as chronic neck muscle strain resulting from plaintiff's

7  multiple prior injuries.  Id.  He remarked that this also causes

8  muscle contraction headaches which are bothersome.  Id.  He has not

9  made observations that lead him to suspect that plaintiff is

10  "faking."  Id.

11    He noted that plaintiff also suffers from marked obesity,

12  deconditioning, and hypertension.  Id.  He explained that while the

13  hypertension itself is not limiting, the medications plaintiff

14  takes for it can cause fatigue and limit energy.  Id.

15    In his conclusion, Dr. Crocker stated:

16  [W]e are now dealing with a man who has had at least
    three major traumas, including broken arms x2, one
17  repaired surgically with plate and screws, a dislocated
    shoulder, a broken ankle repaired with plate and screws
18  [one screw now broken,] a bone chip and an osteophyte in
    one hip.  He has a serious problem in his low back that
19  is degenerative, is not going to get better and will
    likely worsen.  He is grossly overweight, and has been
20  for many years.  He has central sleep apnea with moderate
    sleep disruption.  He has diabetes mellitus - type II
21  with occasional episodes of hypoglycemia.  He has
    evidence of coronary artery disease which is likely to
22  worsen unless he is able to improve on controlling his
    considerable risk factors.  He has occasional break
23  through episodes of severe depression that usually last
    several days.  He has more frequent episodes of severe
24  anxiety with agoraphobia that he reports make it
    impossible for him to leave the home.  He has episodes of
25  severe neck pain and headaches.

26  I believe all of this combined to create severe problems
    for Don, going back to at least 09/07/02.  That is the
27  day Don appeared in my office with swelling.  Since that
    date I have seen Don on at least 34 occasions.  During
28  that same period of time Don has also attended at least

29 - FINDINGS & RECOMMENDATION

10 other appointments for radiology, testing, evaluations. I expect the frequency of medical appointments will not decline in the foreseeable future.

Low back pain, sleep disruption, depression and hypoglycemic episodes will afflict Don so severely there will be days when it is not reasonable to expect Don to attend or complete a normal work day of sedentary, simple, unskilled, repetitive and low stress work. On average, I estimate at least two days per month, probably more.

Taking medical appointments and the affects of low back pain, sleep disruption, depression and hypoglycemic episodes only into account, it is my opinion Don will miss, on average, at least three days of work per month, even if one assumes the most sedentary, unskilled and non-stressful kind of employment.

It is also my opinion that Don will miss time each month, because of symptoms of [shortness of breath], fatigue and poor exercise tolerance caused by obesity, deconditioning and side effects of medications. Neck and shoulder pain and headaches will continue to cause bothersome symptoms.

I have encouraged Don to stop smoking and lose weight. For many people, it is difficult to do either. If he can he should do so. While weight loss or cessation of smoking might not improve his medical conditions, either or both will likely slow down the onset of more serious problems.

Id. at 654-55 (first brackets in original).

II. Plaintiff's Testimony

Plaintiff testified that the last time he worked was in April 2002. Tr. 685. He was laid off at the time, but looked for logging or any laborer work, following the lay off. Tr. 686. He did not find any work. Id. He lives in a mobile home with a fiancé, Connie Dailey, and her three children. Id.

Plaintiff testified about what his attorney referred to as plaintiff's "minor things": two breaks to his left arm in separate accidents and a broken left ankle, all occurring while he was a logger. Tr. 687-89. He also discussed a dislocated shoulder and a bone chip in his hip. Tr. 689. Of all of those, the only one

30 - FINDINGS & RECOMMENDATION

that he noted caused him pain was the hip, which he described as "hurt[ing] pretty good." Id.

Plaintiff testified that his hypertension is controlled with medication, and that his diabetes is managed with oral medication. Tr. 692-93. He described sometimes feeling sick to his stomach, dizzy, and drained as a result of high blood sugars. Tr. 694. He also noted that he gets sick to his stomach and groggy with low blood sugars. Id. When it is low, he eats something, sits, and rests. Id. This occurs one or twice a month. Id. The effects of the low blood sugar episodes last close to a day and make plaintiff feel "wrung out most of the time, most of the rest of the day." Id. He sometimes experiences dizziness as well, more often with low blood sugar episodes than with high. Id. Plaintiff noted that the episodes happen when he fails to eat every few hours, which he indicated makes him feel better. Id.

He checks his blood sugars in the morning, before eating, around noon, and sometimes in the evening. Tr. 707. The highest number he has ever recorded at home was 295. Id. The lowest was 69 or 79. Id. He testified that other than picking up a few pamphlets about the disease at the hospital, he had received no education about diabetes. Tr. 706-07.

On days when his depressive symptoms are bad, plaintiff feels "surrounded by doom and gloom." Tr. 695. He described feeling on the verge of crying and wanting to hide. Id. On a bad day, he is not able to do much of anything; instead, he "slump[s] around the house [and] look[s] out the window." Id. These episodes occur about once per month, lasting for one to three days. Tr. 696.

Plaintiff also described having problems with anxiety. Id.

31 - FINDINGS & RECOMMENDATION

He experiences these problems a couple of times per month, usually out in public while at the store; he panics when someone speaks to him.  Id.  He often sits at home and hopes that if a car slows down, it is not stopping at his house because he does not want to see anybody.  Id.  He stays in his house and looks out the window.  Tr. 698.  He is afraid to go outside.  Id.

Plaintiff noted that counseling had helped his anxiety and depression symptoms.  Tr. 704.  He still did not like being around people very much, but he felt better and did not cry as much as he had been.  Id.  After he stopped counseling, his symptoms returned and he had recently reported an increase in crying to his physician.  Id.  He also noted that he was taking two medications for depression, and that his doctor had recently "raised it again."  Id.  He also started counseling again.  Id.

Plaintiff conceded that most of the injuries he had noted had predated his stopping work.  Tr. 696.  In response to a question by the ALJ to describe what had changed making it so that he could no longer work, plaintiff testified that after he got laid off from work, he gained a lot of weight, then developed diabetes, and his depression worsened.  Id.  When asked what would prevent him from working at something other than logging, plaintiff responded that he wasn't sure and then added "[a]ches and pains, I guess."  Tr. 698.

Plaintiff stated that at the time of the hearing, he continued to have pains in his chest, shortness of breath, and fatigue.  Tr. 701.  He indicated that doing any activity, even bending, caused these symptoms.  Id.  He takes nitroglycerin which helps.  Id.

Plaintiff verified that he had had surgery for obstructive

32 - FINDINGS & RECOMMENDATION

1   sleep apnea and was then prescribed a CPAP machine.  Tr. 703.  At

2   the time of the hearing, he had been using the CPAP machine for

3   three years.  Id.  He believed the CPAP machine was on the highest

4   setting.  Id.

5       Plaintiff described feeling fatigued.  Id.  He has trouble

6   walking 200 feet to the mailbox and once he returns, he has to sit

7   and catch his breath.  Id.  He walks a maximum of 500 feet in a

8   day.  Tr. 709.

9   III.  Lay Witness Testimony

10      Dailey testified at the hearing.  Tr. 711.  At the time of the

11  hearing, she and plaintiff had been together for eight years.  Id.

12  Dailey testified that although plaintiff had been an illegal drug

13  user in the past, plaintiff had not used drugs since they have been

14  together, meaning eight years.  Id.  She further testified that

15  during their relationship, she had become quite concerned about his

16  alcohol use and finally, he had quit drinking in approximately

17  2002.  Tr. 712.

18      Dailey described the period of time in September 2002 when

19  plaintiff went to the emergency room because of swelling.  Tr. 713.

20  She made him go to the hospital to be examined.  Id.  Following

21  that visit, plaintiff saw Dr. Ravuri and was told he had diabetes.

22  Tr. 714.  She could not remember if the swelling abated or

23  persisted.  Id.  She then clarified that she knew the swelling went

24  away, but she could not remember how long it took.  Id.

25      Dailey remarked that plaintiff sometimes has episodes of

26  dizziness and feeling drained.  Tr. 715.  As for back pain, Dailey

27  testified that sometimes, if Dailey's son forgets to bring in wood

28  for their wood box, plaintiff will attempt to do it and ends up

33 - FINDINGS & RECOMMENDATION

with burning pain and "he's down." Tr. 715. Dailey described plaintiff being "down" with back pain a couple of times per month. Id. She testified that it then takes a few days of rest and not doing anything before he recovers. Id. Although she used the wood lifting as an example, she then clarified that the pain occurs with lifting anything. Id.

In describing plaintiff's depression, Dailey noted that on his bad days, plaintiff just sits on the couch and doesn't communicate very much. Tr. 716. She stated that he is "pretty much non functioning." Id. He does not want to be around anybody. Id. She also described him as being nervous about everything and refusing to communicate with the rest of the world. Id. He will not answer the phone. Id.

Dailey noted that plaintiff does drive. Tr. 719. On a good day, he will go grocery shopping, but usually accompanied by Dailey or one of her children. Id. He drives himself to counseling appointments and drove with his mother to see his brother. Tr. 720. On bad days, he goes nowhere. Id.

Dailey testified that plaintiff cannot sleep without his CPAP machine which she thought was set on "12," but she was unsure if that was the highest setting. Id. She thinks it used to be set on "7." Id. Nonetheless, he is still fatigued. Id. She stated that plaintiff had been reporting feeling very tired for the last one to two years. Id.

Dailey described plaintiff's last attempt at working in June 2002. Tr. 723. She stated that he went to work for a logging company, but he came home and found Dailey in the garden and he was crying. Id. He told her he was afraid, and that he was scared

34 - FINDINGS & RECOMMENDATION

that he was going to hurt someone while running the yarder. Id. Dailey said she tried to pressure him a bit by reminding him that it was his first day back to work and he should just try it out. Id. But, she testified, he started crying and could not stop. Id. She indicated that while plaintiff's depression had been there awhile, she had not previously seen this type of panic attack where plaintiff was fearful of hurting someone at work. Id. The next morning, plaintiff was convinced he could not return to work. Tr. 724. That was the last time he tried to work at any job. Id.

IV. Medical Expert Testimony

Dr. Jay Goodman, M.D., testified at the hearing as a medical expert. Tr. 725. He is board certified in Internal Medicine. Id.

Dr. Goodman first discussed plaintiff's sleep apnea. Tr. 727. He noted that when plaintiff was first treated in 1994, he improved. Tr. 728. He noted the record's lack of evidence of the measurement of plaintiff's breathing abilities when he is not asleep. Id. He stated that in terms of listed disorders, there was a lack of evidence in the record to support either a "Chronic Core Pulmanoly" [sic], or an organic mental disorder based on the lack of oxygen. Id.

As for plaintiff's heart problems, Dr. Goodman noted that on the stress tests, plaintiff was able to walk 3.4 miles per hour on a 14% incline, which was better than the criteria set for a listed heart-related impairment. Tr. 729. He further testified that because of plaintiff's size, testing was inconclusive, or was avoided because the risks outweighed the benefits, and thus, it is unclear whether he has ischemic heart disease. Tr. 730. Nonetheless, he continued, even if he had such a disease, he can

35 - FINDINGS & RECOMMENDATION

1  still perform adequately on the stress test.  Id.  Dr. Goodman then

2  opined that none of plaintiff's arrhythmias were functionally

3  significant.  Tr. 731.

4      Dr. Goodman next addressed plaintiff's diabetes and opined

5  that it also did not meet a listed impairment because the record

6  did not reveal a finding of profound neuropathy affecting motor

7  functioning in two extremities.  Tr. 732.  There was no evidence

8  that plaintiff had repeated episodes of going to the hospital

9  because his diabetes was out of control, or any evidence that he

10 suffered from any diabetic eye disease.  Id.

11     Dr. Goodman then noted that plaintiff's orthopedic issues did

12 not rise to a listed criteria because he worked with all of those

13 injuries in the past.  Id.  In Dr. Goodman's opinion, the

14 "watershed event" was when plaintiff had the panic attack in June

15 2002 while attempting to go back to work for a logging company.

16 Tr. 732-33.  He became less and less active after that and in

17 September 2002, appeared to be "terribly deconditioned."  Tr. 733.

18     Dr. Goodman concluded that because, even in a deconditioned

19 state, plaintiff still walked a stage of the "Bruce protocol" in

20 2004, he would be able to perform sedentary and light work

21 activities.  Tr. 734.  He did note that plaintiff had gained more

22 than fifty pounds between the two stress tests, but, plaintiff was

23 at the heavier weight when he did the stress test for Dr. Hahn in

24 2004 and was still able to complete a stage of the protocol.  Tr.

25 734-35.

26     Dr. Goodman testified that putting aside plaintiff's episodes

27 of low back pain and psychological problems, he could not imagine

28 plaintiff having to miss two to three days of work per month.  Tr.

36 - FINDINGS & RECOMMENDATION

738.  He conceded that a person who had spent years of work logging did not have a normal back and episodes of low back pain would be likely.   Id.   He indicated that plaintiff's back issues could conceivably cause a couple of bad days per month where he would be too miserable to go to work.   Id.  He thought that if plaintiff were restricted to light work, that might occur a bit less often.  Id.

V.  Vocational Expert Testimony

Francine Geers testified as a vocational expert.   Tr. 745.  The ALJ presented Geer with the following hypothetical:  an individual 44 years old with a GED and past work as performed by plaintiff; limited to light work or sedentary work that has a sit/stand option, and no prolonged sitting and only occasional climbing; no close work with coworkers or the general public.  Tr. 745-46.  In response, Geers testified that such an individual could not perform plaintiff's past relevant work.

Geers further testified, however, that such an individual would be able to perform the jobs of laundry sorter, motel cleaner, and electronic worker.  Tr. 746.  Finally, Geers testified that if the hypothetical individual would be expected to miss two to three days of work per month at unscheduled times, the individual could not perform those jobs, or any other jobs in the national economy.  Id.

THE ALJ'S DECISION

The ALJ found that plaintiff had not engaged in substantial gainful activity since June 1, 2002, his alleged onset date.  Tr. 25, 39.  She next determined that plaintiff suffered from severe impairments of obesity, diabetes, degenerative disc disease,

37 - FINDINGS & RECOMMENDATION

depression, and sleep apnea.  Tr. 36, 39.  However, the ALJ found that plaintiff's impairments, either singly or in combination, did not meet or equal a listed impairment.  Id.

Next, the ALJ determined plaintiff's residual functional capacity (RFC).  Tr. 36-37.  The ALJ concluded that plaintiff retained the RFC for light exertion work activity, involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds, with only occasional climbing and no prolonged sitting.  Tr. 37, 39.  She also concluded that plaintiff was precluded from close work with co-workers or the general public.  Id.

In reaching this conclusion, the ALJ, as discussed more fully below, rejected Dr. Crocker's "endorsement" of disability, found plaintiff and his lay witness only partially credible, and accepted Dr. Goodman's limitation of light work over the limitations suggested by Dr. Pritchard.  Tr. 36-37.  Based on the RFC, the ALJ concluded that plaintiff could not return to his past relevant work.  Tr. 38, 39.  However, the ALJ concluded that plaintiff was able to perform the jobs of laundry sorter, metal cleaner, and electrical worker, all existing in significant numbers in the national economy.  Tr. 38, 40.  Thus, the ALJ concluded that plaintiff was not disabled.  Tr. 39, 40.

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  Disability claims are evaluated according

38 - FINDINGS & RECOMMENDATION

to a five-step procedure. <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th Cir. 1991).  The claimant bears the burden of proving disability.  <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work.  <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

39 - FINDINGS & RECOMMENDATION

1    The court may set aside the Commissioner's denial of benefits

2    only when the Commissioner's findings are based on legal error or

3    are not supported by substantial evidence in the record as a whole.

4    Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a

5    mere scintilla," but "less than a preponderance."  Id.  It means

6    such  relevant  evidence  as  a  reasonable  mind  might  accept  as

7    adequate to support a conclusion.  Id.

8                              DISCUSSION

9        Plaintiff challenges the ALJ's decision at step five that he

10   is capable of performing other work in the national economy.  While

11   he raises several independent arguments, they all are aimed at the

12   ALJ's  conclusions  regarding  plaintiff's  residual  functional

13   capacity.  Specifically, plaintiff argues that the ALJ erred by (1)

14   rejecting  the  opinion  of  treating  physician  Dr.  Crocker;  (2)

15   failing to accept Dailey's testimony; and (3) failing to accept the

16   opinion of Dr. Pritchard.  I address plaintiff's arguments in turn.

17       A.   Dr. Crocker

18       Plaintiff  contends  that  the  ALJ  improperly  rejected  Dr.

19   Crocker's  comprehensive  opinion,  concluding  that  plaintiff's

20   impairments combined would cause him to miss two to three days of

21   work per month.

22           To reject an uncontradicted opinion of a treating or
            examining doctor, an ALJ must state clear and convincing
23           reasons that are supported by substantial evidence. . .
            . If  a  treating  or  examining  doctor's  opinion  is
24           contradicted by another doctor's opinion, an ALJ may only
            reject it by providing specific and legitimate reasons
25           that are supported by substantial evidence.

26   Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation

27   omitted).  Dr. Crocker's opinion was based on plaintiff suffering

28   from several impairments.  Because the ALJ discretely addressed Dr.

40 - FINDINGS & RECOMMENDATION

Crocker's assessment of plaintiff's impairments, plaintiff makes
several discrete challenges.

            1.  Diabetes

     Plaintiff contends that the ALJ improperly rejected Dr.
Crocker's statements regarding plaintiff's hypoglycemia.  In his
January 2005 report, Dr. Crocker stated that plaintiff was taking
two oral medications with reasonably good control of his diabetes,
but that he still had days when his blood sugars fluctuated
significantly and on those days, he is "wiped out" for the day.
Tr. 653.

     The ALJ addressed this as follows:

        Regarding "fluctuating" blood sugars, Dr. Crocker's
        records show only that the claimant occasionally had
        symptoms of hypoglycemia.  The Merck Manual, Sixteenth
        Ed., states, "The majority of cases of hypoglycemia occur
        in patients treated with insulin or a sulfonylurea (anti-
        diabetic agent) or who have recently ingested alcohol."
        Symptoms include sweating, nervousness, termulousness,
        faintness, and palpitations.  Dr. Crocker did not note
        what "symptoms" of hypoglycemia the claimant had, but he
        did note that the symptoms were relieved by eating.
        (Exhibit 18F/16).  Evidence shows that the claimant's
        diabetes has been generally well controlled; there is a
        distinct absence of references to fluctuating blood
        sugars in the medical records (Exhibits 4F, 15F, and
        18F).

Tr. 27.

     Plaintiff argues that the ALJ improperly relied on the Merck
Manual to justify her conclusion that "[p]laintiff would not have
hypoglycemic episodes."  Pltf's Mem. at p. 6.

     Defendant notes that the ALJ did not conclude that plaintiff
would not have hypoglycemic episodes; rather, the ALJ rejected Dr.
Crocker's conclusion that any hypoglycemia caused by fluctuating
blood sugars would cause him to be "wiped out" for a day.

     I agree with defendant.  My reading of the ALJ's opinion

41 - FINDINGS & RECOMMENDATION

indicates that the ALJ relied on the <u>Merck Manual</u> in an attempt to suggest that plaintiff himself could control his hypoglycemic episodes by avoiding the ingestion of alcohol.  While that may or may not be an appropriate insinuation by the ALJ, it did not provide the basis for her rejection of Dr. Crocker's limitation allegedly caused by the hypoglycemia.

The ALJ appropriately noted that the medical record lacked any reference to fluctuating blood sugars, to any particular functional symptoms created by a hypoglycemic episode, and in contrast, showed that plaintiff's diabetes was relatively well controlled. The ALJ also referred to Dr. Goodman's testimony that plaintiff's hearing testimony regarding his blood sugar levels would not cause dizziness and that in the absence of more "dramatic numbers far worse than the numbers we're talking about," the fluctuations would not generally cause the claimed symptoms.  Tr. 33, 735-36.

Contradictions or discrepancies between a physician's assessment and his or her notes and recorded observations, provide clear and convincing reasons to reject that assessment.  <u>Bayliss</u>, 427 F.3d at 1216.  Such is the case here.

### 2.   Depression/Anxiety

In his January 2005 report, Dr. Crocker noted that counseling and medications had helped plaintiff's depression, but that he still had episodes of dysphoria which last more than one day.  Tr. 653. He expected these to continue despite ongoing treatment with medication and counseling.  <u>Id.</u>

He further stated that plaintiff's anxiety attacks with agoraphobia frequently interfere with plaintiff's life.  <u>Id.</u>  He stated that he had personally witnessed these attacks.  <u>Id.</u>  He

42 - FINDINGS & RECOMMENDATION

indicated that while plaintiff responded to medication, he would still experience episodes of break-through anxiety when he found it impossible to leave the house to walk to the mailbox.  Id.

The ALJ first noted that Dr. Crocker's chart notes contained no notations regarding any personal observation of plaintiff's anxiety and agoraphobia.  Tr. 28.  She also noted that Dr. Crocker could not have personally observed plaintiff's inability to leave the house to walk to the mailbox because of his anxiety, and thus, he was repeating plaintiff's allegations.  Id.

The ALJ then recited relevant evidence in the medical record regarding plaintiff's depression and anxiety, including the positive response to medication and the frequent references by Dr. Crocker to plaintiff appearing "upbeat," "really quite bright," "fairly upbeat," and "fairly bright."  Id.  The ALJ specifically noted that after a December 2002 complaint of feeling down in the dumps, plaintiff responded well to a change in medication and Dr. Crocker wrote in January 2003 that he was "feeling really quite well in terms of his mood and sense of well-being."  Id.

The ALJ then discussed Dr. Reagan's April 2003 report, noting particularly that the GAF of 55 suggested moderate difficulties in functioning, and that the observed "modestly anxious mood," did not warrant a diagnosis for such and there was no indication or diagnosis of agoraphobia.  Tr. 29.  The ALJ next summarized plaintiff's treatment with Embury at Douglas County Mental Health and noted that his case was closed in June 2004, a few months after Embury stated that plaintiff was no longer clinically depressed. Id.

The ALJ rejected Dr. Crocker's assessment of plaintiff's

43 - FINDINGS & RECOMMENDATION

depression because the medical evidence showed that medication and counseling were effective.  Tr. 34.  She also noted that when counseling was terminated, his GAF was 72, suggesting that if symptoms were present, they were transient and expectable reactions to psychological stressors and were no more than a slight impairment in social, occupation, or school functioning.  Tr. 34. Finally, the ALJ also remarked that Dr. Crocker's chart notes describing plaintiff's mood were inconsistent with his opinion that plaintiff suffered from severe anxiety and depression.  Tr. 37

Plaintiff contends that the ALJ erred by interpreting Dr. Crocker's report as suggesting that Dr. Crocker himself had personally observed plaintiff's anxiety attacks with agoraphobia. Pltf's Brief at pp. 6-7.  Plaintiff's argument is off the mark, however, because Dr. Crocker expressly stated in his January 2005 report that "[a]ttacks of anxiety with agoraphobia interfere with Don's life frequently.  These I have personally witnessed, and when the[y] occur, they are often severe."  Tr. 653.  The only rational interpretation of that statement is that Dr. Crocker personally observed plaintiff having anxiety attacks.  But, as the ALJ correctly noted, no such observation is reported in Dr. Crocker's chart notes.

Plaintiff agrees with the ALJ's statement that Dr. Crocker was relying on plaintiff's report of symptoms.  Pltf's Brief at p. 7. But, plaintiff notes, Dr. Crocker indicated that in his years of treating plaintiff, Dr. Crocker never concluded that plaintiff exaggerated his symptoms.  Id.

As defendant points out, however, the ALJ noted a number of reasons that plaintiff's subjective presentation lacked credibility

44 - FINDINGS & RECOMMENDATION

and plaintiff has not challenged that finding in this appeal. As the ALJ mentioned, it is difficult to ignore plaintiff's statements that he did not want to lose weight or work on changing his life until he received disability. Tr. 29, 34. A physician's opinion of disability "premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted." Flaten v. Secretary, 44 F.3d 1453, 1463-64 (9th Cir. 1995) (internal quotation omitted); see also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ was free to reject physician's opinion which was premised on claimant's subjective complaints where ALJ discounted claimant's credibility). Thus, the ALJ did not err by basing her rejection, at least in part, of Dr. Crocker's assessment of the severity of plaintiff's depression on the fact that the assessment was derived from plaintiff's subjective statements, which the ALJ found not credible.

The ALJ also based her rejection of Dr. Crocker's assessment on its inconsistency with Dr. Crocker's chart notes indicating that plaintiff's mood was "fairly upbeat," and his affect "fairly bright." Plaintiff argues that such chart note descriptions are not in fact inconsistent with Dr. Crocker's opinion that plaintiff's depression and anxiety may still be occasionally debilitating. I disagree.

The record as a whole, and as described by the ALJ in support of her rejection of Dr. Crocker's assessment of plaintiff's depression and anxiety, does not provide substantial evidence of occasional "breakthrough" episodes of anxiety or depression that incapacitate plaintiff for short periods of time. Rather, Dr.

45 - FINDINGS & RECOMMENDATION

Crocker's chart notes demonstrate complaints of depression or anxiety, which responded well to treatment by medication and counseling.  The record is capable of suggesting that these may be ongoing issues in plaintiff's life, but it is devoid of references to crisis-like, completely incapacitating episodes as Dr. Crocker suggests.   The ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Dr. Crocker's assessment regarding the severity of plaintiff's depression and anxiety.

### 3.  Number of Visits

Dr. Crocker noted in his January 2005 report, that plaintiff's impairments "combined to create severe problems" for plaintiff, dating back to September 7, 2002, when plaintiff experienced an episode of swelling, primarily in his abdomen.  Tr. 654.  He stated that "[s]ince that date, I have seen Don on at least 34 occasions. During that same period of time Don has also attended at least 10 other appointments for radiology, testing, [and] evaluations.  I expect the frequency of medical appointments will not decline in the foreseeable future."  Id.  Dr. Crocker then predicted that the frequency of plaintiff's medical visits would contribute to plaintiff's missing at least three days of work per month.   Tr. 654-55.

In her decision, the ALJ noted that plaintiff testified that he generally saw Dr. Crocker only once per month.  Tr.  31. She also asserted that "a careful review of the record shows that Dr. Crocker saw the claimant 17 times, and the claimant was seen by one of Dr. Crocker's associates on five occasions for a total of 22 clinic visits."  Id.  She further noted that as to the other ten

46 - FINDINGS & RECOMMENDATION

visits, the record revealed only eight such visits, one of which was to the psychiatric consultative examination with Dr. Reagan ordered by Disability Determination Services. Id. She also noted that plaintiff's medical appointments were not such that missing an entire day of work would have been necessary. Id. Thus, she concluded that Dr. Crocker's suggestion that plaintiff would miss a lot of work days because of his medical appointments was not logical or objectively supported. Id.

Plaintiff argues that a careful review of the record actually shows "at least 23 entries both typed and handwritten reflecting visits by Plaintiff to Dr. Crocker's clinic reflected on pages 234-42 [in the Administrative Record] that were in the time period Crocker saw Plaintiff and 20 additional entries reflected on pages 475 to 490 [of the Administrative Record]." Pltf's Brief at p. 7. Plaintiff contends that because Dr. Crocker's estimate of the number of visits is more accurate than the ALJ's, it is the ALJ's credibility that should be questioned, not Dr. Crocker's. Id.

Dr. Crocker's statement in his January 2005 report, unambiguously states that he has seen plaintiff on at least 34 occasions since September 7, 2002. Tr. 654. In support of his argument that pages 234-42 of the administrative record show twenty-three visits to Dr. Crocker's clinic, plaintiff fails to note that pages 239-42 reflect visits to Dr. Crocker's clinic before September 7, 2002. Tr. 239-42. The number of visits to Dr. Crocker's clinic[10] demonstrated on the remainder of those cited

[10]    I include here visits to Dr. Crocker or another physician in his office.

47 - FINDINGS & RECOMMENDATION

1   pages, which cover September 7, 2002, through February 4, 2003, is

2   five.[11]  Plaintiff next cites to pages 475-90 as evidence of twenty

3   additional visits to Dr. Crocker's clinic.  These pages cover the

4   time period of July 31, 2003, to August 30, 2004.  Tr. 475-90.  I

5   count a total of twelve visits to Dr. Crocker's clinic during this

6   time period.  Id.

7       Thus, the total number of visits to Dr. Crocker or to another

8   physician in his clinic beginning on September 7, 2002, is

9   seventeen.  The ALJ actually over-represented the number of visits

10  in her decision.  The ALJ did not err in rejecting Dr. Crocker's

11  opinion based on the frequency of his visits, as inconsistent with

12  the record.

13              4.  Dr. Goodman's Testimony

14      The ALJ discussed the testimony of medical expert Dr. Goodman.

15  Tr. 33.  The ALJ then stated that Dr. Crocker's assessments were

16  unsupported by objective findings or correlation to the underlying

17  conditions, in contrast to the testimony of Dr. Goodman who looked

18  at the objective limitations evidence and reported the limitations

19  which could be expected.  Id.  She further stated that Dr.

20  Crocker's opinion that plaintiff would miss three days of work per

21  month was not supported by his own report of doctor's visits and

22  was inconsistent with Dr. Goodman's objective supporting testimony.

23  Id.

24      Plaintiff argues that the ALJ erred by relying on Dr.

25

26      [11]  It is disingenuous, at best, for plaintiff to count a
    handwritten chart note, immediately followed by a typed chart
27  note, which are obviously written for the same visit, as more
    than one visit.  I have appropriately counted such entries as one
28  visit, not two.

48 - FINDINGS & RECOMMENDATION

1  Goodman's testimony because an opinion by a consultative physician

2  is not objective evidence and cannot be used to discredit a

3  treating physician's opinion.  I disagree.

4      Plaintiff correctly notes that a "nonexamining medical

5  advisor's testimony does not by itself constitute substantial

6  evidence that warrants a rejection of either the treating doctor's

7  or the examining psychologist's opinion." Lester v. Chater, 81

8  F.3d 821, 833 (9th Cir. 1995) (emphasis added).  But, as Lester

9  notes, the ALJ may properly reject the opinion of a treating or

10  examining physician, based in part on the testimony of a

11  nonexamining medical advisor.  Id. at 831 (citing Magallanes v.

12  Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989) (ALJ relied not only on

13  testimony of nonexamining medical expert but also on laboratory

14  test results, contrary reports from examining physicians, and

15  testimony from the claimant that conflicted with her treating

16  physician's opinion).

17      Here, the ALJ discredited Dr. Crocker's opinion regarding the

18  number of days of work plaintiff would miss because it was based,

19  in part, on his erroneous assertion of the number of times he had

20  seen plaintiff in the relevant time period and thus, his opinion

21  was not based on the evidence in the record.  The ALJ was therefore

22  entitled to also rely on Dr. Goodman's testimony on this issue.

23          5.  Sleep Apnea and Back Pain

24      The ALJ recited plaintiff's medical history relative to his

25  sleep apnea.  Tr. 26.  She found the sleep apnea to be a severe

26  impairment.  Tr. 36.  But, she noted that Dr. Crocker did not

27  provide any specific functional limitations other than his

28  testimony that plaintiff would miss work a certain number of days

49 - FINDINGS & RECOMMENDATION

1  per month.  Tr. 33.

2      The ALJ noted that in 1994, when plaintiff was first diagnosed

3  with sleep apnea, his oxygen saturation was extremely low at 64%.

4  Id.  However, she noted, that despite such a low reading, plaintiff

5  was able to work at heavy to very heavy levels of exertion, walking

6  several miles per day, up and down hills in the woods.  Id.  When

7  he was tested in 2002, his oxygen saturation was 96% on room air at

8  rest which was in the normal range.  Id.  He successfully exercised

9  into Stage III on the "Bruce protocol" treadmill test, in both 2001

10 and 2004.  Id.  The ALJ also noted Dr. Crocker's April 20, 2004

11 assessment that plaintiff was using the CPAP machine for his

12 obstructive sleep apnea, "with good response."  Tr. 34, 478.

13     Based on this evidence in the record, the ALJ did not discern

14 any particular functional limitations based on plaintiff's sleep

15 apnea.  Rather, she accepted Dr. Goodman's opinion that the record

16 did not support an ability to "quantitate" the "trouble" caused by

17 the sleep apnea, and concluded that plaintiff's myriad ailments

18 produced a residual physical functional limitation of light work.

19 Tr. 33, 37, 728.

20     Plaintiff contends that an April 2005 sleep apnea evaluation,

21 obtained after the ALJ hearing in this case, is a basis for

22 reversal of the ALJ's opinion and establishes plaintiff's

23 disability.  While I agree with plaintiff that the evidence may be

24 properly reviewed, I disagree with plaintiff regarding its effect.

25     The sleep apnea study was performed on April 12, 2005,

26 approximately four months after the hearing and approximately two

27 weeks before the ALJ issued her decision.  Tr. 672-77.  It was

28 submitted to the Appeals Council.  Tr. 12.  The Appeals Council

50 - FINDINGS & RECOMMENDATION

made the evidence part of the record.    <u>Id.</u>    In its Notice of
Appeals Council Action, the Appeals Council stated that in reaching
its decision, it considered the reasons plaintiff disagreed with
the ALJ's decision "and the additional evidence listed on the
enclosed Order of Appeals Council." Tr. 9.  It explained that the
"[Appeals Council] found that this information does not provide a
basis for changing the Administrative Law Judge's decision."  <u>Id.</u>
at 9-10.

Under these circumstances, it is appropriate to consider the
evidence submitted to the Appeals Council. <u>See</u> <u>Ramirez v. Shalala</u>,
8 F.3d 1449, 1451-52 (9th Cir. 1993) (appropriate for court to
consider both the ALJ's decision and additional material submitted
to the Appeals Council when, although Appeals Council "declined to
review" the ALJ's decision, it made its ruling after examining the
entire record, including additional material submitted to it after
the ALJ hearing, and concluded that the ALJ's decision was proper
and that the additional material failed to provide a basis for
changing the hearing decision).

Accordingly, I have reviewed the April 2005 sleep apnea study.
I conclude, however, that the evidence does not warrant remand.
"In determining whether to remand a case in light of new evidence,
the court examines . . . whether the new evidence is material to a
disability determination[.]" <u>Mayes v. Massanari</u>, 276 F.3d 453, 462
(9th Cir. 2001); <u>see also</u> <u>Burton v. Heckler</u>, 724 F.2d 1415, 1417
(9th Cir. 1984) (to meet materiality requirement, new evidence
offered must bear directly and substantially on the matter in
dispute, presenting a reasonable possibility of changing the
outcome of the Secretary's determination).

51 - FINDINGS & RECOMMENDATION

1    The new evidence shows that during the initial diagnostic
2  portion of the study, plaintiff's overall apnea plus hypopnea index
3  was elevated at 99.9 respiratory events per hour of sleep.   Tr.
4  672.   His lowest oxygen saturation was 81%.   <u>Id.</u>   However,
5  "[d]uring the second portion of the study, nasal CPAP was applied
6  and was titrated up to an optimal level of 17 cm H2O.   While on
7  CPAP, there was significant improvement in respiratory pattern,
8  oxygen saturation, and sleep architecture."   <u>Id.</u>   The
9  recommendations were to treat with the nasal CPAP at level 17 for
10 home nightly use, to begin a supervised weight reduction program,
11 and avoid alcohol and sedative medications.   <u>Id.</u>   Reevaluation was
12 recommended if compliance with CPAP therapy was poor or if symptoms
13 of sleep disturbance persist despite the treatment with CPAP
14 therapy.   <u>Id.</u>

15    This evidence does not present a reasonable possibility of
16 changing the outcome of the ALJ's determination.   At the time the
17 ALJ rendered her decision, the record showed that plaintiff had
18 moderate sleep disturbance from his sleep apnea, Tr. 513-14, had
19 received the CPAP machine after Dr. Crocker reported that his sleep
20 apnea was "quite symptomatic," Tr. 384, and had a variety of
21 reports after obtaining the machine, including that his sleep was
22 good, fair, or he was sleeping well.   Tr. 368, 377, 487.   Dr.
23 Crocker noted that he had a good response to the CPAP machine in
24 April 2004.   Tr. 478.   The new evidence is not inconsistent with
25 the evidence already in the record in that it shows that plaintiff
26 has a severe impairment of sleep apnea that responds well to the
27 CPAP machine.   The only new information in the April 2005 report is
28 that the machine should now be set on 17.   Notably, the April 2005

52 - FINDINGS & RECOMMENDATION

report fails to establish any particular functional limitation as a result of the sleep apnea. Thus, remand is not warranted for further consideration of this evidence.

As for plaintiff's low back pain, Dr. Crocker, as noted above, opined in January 2005 that plaintiff suffered from a "rather severe low back condition." Tr. 653. In support of this opinion, he referred to x-rays showing moderately severe degenerative disc disease and facet osteoarthrosis. Id. He further explained that the conditions shown on the x-rays could account for severe episodes of low back pain. Tr. 653-54.

Dr. Crocker then concluded that plaintiff's low back pain, along with his sleep disruption, depression, and hypoglycemic episodes, would render plaintiff unable to attend or complete a normal work day of sedentary, simple, unskilled, repetitive, and low stress work. Tr. 654. Dr. Crocker also cited low back pain as one of the reasons why plaintiff would miss, on average, at least three days of work per month. Id.

In her decision, the ALJ noted that Dr. Crocker's January 2005 characterization of plaintiff's October 2003 x-ray as showing moderately severe degenerative disc disease was inconsistent with his more contemporaneous chart note which described the x-ray as showing modest degenerative disc disease. Tr. 30. She also noted that Dr. Crocker described plaintiff as having only intermittent problems for which he prescribed a non-steroidal anti-inflammatory drug. Id.

The ALJ noted that Dr. Goodman, the medical expert, had testified, in response to a question as to whether it was likely that plaintiff would miss two or three days of work per month, that

53 - FINDINGS & RECOMMENDATION

plaintiff's back problems could conceivably cause plaintiff to have "a couple bad days a month that he just would be miserable to go into work." Tr. 33, 738. She also noted that Dr. Goodman opined that plaintiff would "do better" with light work. Tr. 33. The ALJ concluded, based on Dr. Goodman's testimony, that plaintiff's moderately severe degenerative disc disease reasonably limits lifting to the light level. Tr. 37.

In summary, the ALJ rejected Dr. Crocker's assessment of plaintiff's back pain as severe because that assessment had previously been one of modest, as opposed to moderate, degenerative disc disease, the assessment was inconsistent with the lack of stronger pain medications, and the assessment was inconsistent with the chart notes which failed to reveal consistent complaints of back pain. Additionally, after rejecting Dr. Crocker's assessment of the severity of the condition, the ALJ rejected Dr. Crocker's conclusion that plaintiff's back would contribute to his missing two to three days of work per month, and she accepted instead the opinion of Dr. Goodman that if plaintiff was limited to light work, his back pain would not cause him to miss that much work.

Plaintiff argues that an MRI performed on May 26, 2005, after the ALJ issued her decision in this case, demonstrates that the ALJ erred in rejecting Dr. Crocker's opinions regarding plaintiff's low back pain. The radiologist's report shows "central and marked right posterolateral disk protrusion with loss of posterior annulus at L4/5, where marked disk space narrowing is seen." Tr. 671. It also confirms the presence of "anterior disk protrusion with intact anterior annulus . . . [which] likely produces encroachment upon the right descending and exiting nerve roots at this level." Id.

54 - FINDINGS & RECOMMENDATION

Although, for the reasons articulated above in regard to the post-hearing evidence about plaintiff's sleep apnea, it is appropriate for me to consider this evidence, I conclude that it does not provide a basis for remand.

First, the ALJ did not err in rejecting Dr. Crocker's determination that plaintiff's back pain was severe, based upon the evidence in the record at the time of the hearing. The ALJ properly recited inconsistencies between Dr. Crocker's determination and (1) the minimal levels of pain medication plaintiff has taken for his back pain, (2) Dr. Crocker's chart notes which reflect only occasional and intermittent complaints about back pain.[12]

Second, the ALJ did not err in rejecting Dr. Crocker's opinion that plaintiff's low back pain was one of the factors contributing to his need to miss two to three workdays each month. Because the ALJ relied so heavily on Dr. Goodman's opinion regarding the limited impact of plaintiff's back pain and his opinion that light work was a reasonable accommodation for that pain, it is important to review exactly what Dr. Goodman said.

_____

[12] The fact that Dr. Crocker once referred to the October 2003 x-rays as showing modest degenerative disc disease and then, in his January 2005 report, referred to the x-rays as showing moderate degenerative disc disease, is an inappropriate basis for rejecting Dr. Crocker's assessment of the severity of plaintiff's back pain because the x-ray report itself, issued by the radiologist in October 2003, recites that the x-rays show moderate degenerative disc disease and thus, it is more likely than not that Dr. Crocker's choice of the word modest, as opposed to moderate, was not intended to vary from that x-ray report. Nonetheless, since the other two reasons cited by the ALJ in support of her rejection of Dr. Crocker's assessment of the low back condition as severe, are adequately supported in the record, there was no error in rejecting that assessment.

55 - FINDINGS & RECOMMENDATION

In the discussion of plaintiff's back pain with the ALJ, Dr. Goodman testified that the record did not reveal much treatment for "back issues.  Tr. 739.  He stated that other than the x-rays, there was no physical examination performed regarding the back pain.[13]  Id.

Plaintiff's attorney picked up the questioning at that point, and asked Dr. Goodman if the moderately severe degenerative disc disease revealed by the x-rays would produce symptoms of lower leg pain or "give way" pain.  Id.  Dr. Goodman responded "unequivocally" no, because, he explained, an x-ray, in and of itself and divorced from a physical examination and history, is an inaccurate way to draw a conclusion.  Tr. 741.  He indicated that the best evidence is a physical examination and that having an x-ray is not helpful because many people have "profoundly abnormal x-rays and are non-symptomatic."  Id.

Plaintiff's attorney then attempted to clarify that the basis for Dr. Goodman's opinion was the absence of a neurological exam and the absence of an MRI.  Id.  Dr. Goodman responded "[n]o," and stated that an MRI was even more unhelpful because, like an x-ray, it can "get you into" a "misleading pathway."  Id.  He continued to maintain that a history and physical exam, done carefully, was the

---

[13]  It appears that in November 1992, in response to a complaint by plaintiff of low back pain, a limited physical examination consisting of measuring plaintiff's flexion and performing a straight leg test, was done, but this is approximately ten years before plaintiff's alleged disability onset date.  Tr. 405.  In October 2003, when plaintiff complained of a recurrence of low back pain, the only examination that was performed was a palpation of the lumbar area and sacroiliac joint.

56 - FINDINGS & RECOMMENDATION

1  most reliable diagnostic tool.  Id.

2      The new MRI evidence does not change the absence in the record

3  of a physical and neurological examination related to plaintiff's

4  back pain, which would reveal the level of functional limitation,

5  if any, produced by the degenerative disk disease, which the ALJ

6  recognized  as  a  severe  impairment,  or  produced  by  the  nerve

7  compression revealed by the MRI.  As Dr. Goodman explained, x-ray

8  and MRI test results by themselves exist more or less in a vacuum,

9  and when unaccompanied by a physical examination, do not provide

10  support for an assessment of functional limitation.  Without such

11  an  examination,  especially  one  performed  contemporaneously  with

12  plaintiff's intermittent complaints of back pain seen in the chart

13  notes, the new post-decision evidence does not provide a basis for

14  changing the outcome of the Secretary's determination.  Thus, it

15  does not provide a basis for remand.

16      B.  Dailey's Testimony

17      Lay  witnesses  are  not  competent  to  testify  to  medical

18  diagnoses, but they are competent to testify as to a plaintiff's

19  symptoms or how an impairment affects his or her ability to work.

20  Stout v. Commissioner, 454 F.3d 1050, 1053 (9th Cir. 2006).  The

21  ALJ  may  disregard  a  lay  witness's  testimony  by  offering  reasons

22  germane to the witness.  Dodrill v. Shalala, 12 F.3d 915, 919 (9th

23  Cir.  1993).   If  the  ALJ  notes  "arguably  germane  reasons"  for

24  dismissing  the  lay  witness  testimony,  he  is  not  required  to

25  "clearly link his determination to those reasons."  Lewis v. Apfel,

26  236 F.3d 503, 512 (9th Cir. 2001).

27      Dailey's testimony at the hearing is recited above.  The ALJ

28  set  forth  Dailey's  testimony  and  then  stated  that  "[Dailey's]

1  reports reflect some of what she observed and do not necessarily
2  reflect what the claimant is capable of actually doing." Tr. 32.

3      Plaintiff argues that this is not a sufficient rejection of
4  Dailey's testimony because, rather than offering a reason germane
5  to this witness's testimony, the ALJ set forth a general rejection
6  capable of being used on any lay witness.  If this were the ALJ's
7  only comment in support of rejecting Dailey's testimony, I agree
8  with plaintiff that it is legally insufficient.  As noted above,
9  the thrust of a lay witness's testimony is his or her observations
10 of symptoms and the effect of those symptoms on the claimant's
11 ability to work or to engage in activities of daily living.   To
12 discredit a lay witness's testimony because the witness's testimony
13 reflected only the witness's observations, is at complete odds with
14 the very nature of all lay witness testimony.

15     As defendant points out, however, the ALJ made additional
16 comments about Dailey's testimony in the context of discussing
17 plaintiff's allegations of back pain.  The ALJ noted that Dailey's
18 testimony that plaintiff was "laid up" for a couple of days after
19 any kind of lifting activity, specifically hauling firewood into
20 the house, was inconsistent with plaintiff's rare complaints of
21 severe musculoskeletal pain and lack of treatment for back pain
22 other than prescribed nonsteroidal anti-inflammatory medications
23 and a one-time prescription for Vicodin.  Tr. 37.

24     Inconsistency with the medical record is a germane reason for
25 discrediting a lay witness's testimony.  Bayliss, 427 F.3d at 1218.
26 Thus, the ALJ did not err in rejecting Dailey's testimony based on

27
28

58 - FINDINGS & RECOMMENDATION

1    its inconsistency with the medical record.[14]

2        C.  Dr. Pritchard

3        Plaintiff  contends  that  the  ALJ  failed  to  address  Dr.

4    Pritchard's  August  5,  2003  adoption  of  Dr.  Lahr's  May  2003

5    assessment limiting plaintiff to standing no more than two hours in

6    an  eight-hour  day  due  to  plaintiff's  obesity.    Tr.  273,  280.

7    Plaintiff is in error.

8        The  ALJ  specifically  addressed  Dr.  Pritchard's  August  2003

9    report and noted the standing/walking two-hour limitation.  Tr. 37.

10   The  ALJ  rejected  that  assessment  because  plaintiff's  obesity  had

11   not precluded him from performing heavy work on his feet for eight

12   hours  per  day.   Id.   Thus,  she  accepted  Dr.  Goodman's  limitation  to

13

14       [14]  The  ALJ  also  noted,  and  defendant  argues  as  well,  that
15   the ALJ rejected Dailey's testimony not only because it was
     inconsistent with the medical record, but because it was
16   inconsistent with plaintiff's own testimony regarding his back
     pain.  Tr. 37; Def't Mem. at p. 9.  Both the ALJ and defendant
17   quote plaintiff as describing his back pain as not disabling but
     rather, "intermittent and annoying."  Id.  The cited reference is
18   to page 173 of the Administrative Record, or page 4 of Exhibit
     11E.
19       The ALJ and defendant have clearly misunderstood plaintiff's
20   testimony.  The exhibit is a July 3, 2003 written statement by
     plaintiff of his various medical problems and symptoms.  Tr. 173.
21   In the section headed "PAIN," he initially describes pain in his
     left arm, elbow, shoulder, right hip, and left ankle.  Id.  He
22   describes the pain in these areas as not disabling but
     "intermittent and annoying."  Id.  In the next paragraph, he
23   describes his back pain.  He notes that he has daily low back
     pain which becomes unbearable at times.  Id.  It is obvious that
24   the reference to "intermittent and annoying" pain is limited to
25   the pain in areas other than plaintiff's back.
         Nonetheless, because the rejection of Dailey's testimony as
26   being inconsistent with plaintiff's testimony is in addition to
27   the sufficient basis of being inconsistent with the medical
     evidence, I do not consider this error fatal to affirming the
28   ALJ's rejection of Dailey's testimony.

59 - FINDINGS & RECOMMENDATION

light work over Dr. Pritchard's and Dr. Lahr's assessments.   <u>Id.</u>

Social Security Ruling 96-6p provides that the ALJ may not ignore opinions made by state agency physicians regarding the nature and severity of a claimant's impairments.   Soc. Sec. Ruling 96-6p (found at 1996 WL 374180).   Rather, the ALJ is required to explain the weight attributed to these opinions.   <u>Id.</u>   The ALJ did not ignore Dr. Pritchard's opinion and satisfactorily explained why she did not credit his stand/walk limitation.   The ALJ made no error in this regard.

CONCLUSION

I recommend that the Secretary's decision be affirmed.   If this recommendation is adopted upon review by an Article III District Court Judge, I recommend that a Judgment in the Secretary's favor be entered.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.   Objections, if any, are due February 13, 2007.   If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due February 27, 2007, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this <u> 29th </u> day of <u> January </u>, 2007.


<u> /s/ Dennis James Hubel </u>
Dennis James Hubel
United States Magistrate Judge

60 - FINDINGS & RECOMMENDATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

61 - FINDINGS & RECOMMENDATION